## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| BETH SHAK<br>c/o Hangley Aronchick Segal Pudlin &<br>Schiller<br>One Logan Square<br>Philadelphia, PA 19103,<br><br>               Plaintiff,<br><br>      v.<br><br>MARK JAY KRUM<br>500 East 83rd Street<br>Suite 8k<br>New York, NY 10028<br><br>           Defendant. | CIVIL ACTION<br><br>No. _____ |

## COMPLAINT

Plaintiff Beth Shak files this Complaint against Mark Jay Krum and in support avers the following:

## INTRODUCTION

1.      This action arises out of a blind date between Ms. Shak and Mr. Krum that went terribly, terribly awry and has turned into a nightmare for Ms. Shak, subjecting her to harassment, threats, and, on top of it all, a demand that she pay Mr. Krum over $135,000 in alleged legal fees simply because she decided against pursuing a civil action against her soon-to-be-ex-husband ("ex-husband").

2.      During the initial blind date, Mr. Krum aggressively questioned Ms. Shak regarding her relationship with her ex-husband and stated to Ms. Shak that she should sue her ex-husband.

3. Over the next several days, Mr. Krum continued to state that Ms. Shak should sue her ex-husband and pressed her to retain him on a contingent basis to do so.

4. Ms. Shak ultimately agreed, signing a contingent fee agreement with Mr. Krum that expressly provided she would owe no fees if no recovery was had. Indeed, the contingent fee agreement expressly states: "CLIENT shall pay no attorney's fees if no monetary recovery is made."

5. At Mr. Krum's requirement, Ms. Shak also provided him with a $10,000 retainer check, which he insisted she designate on the memo line as "non-refundable cost retainer."

6. When Ms. Shak subsequently expressed serious reservations regarding the draft complaint and suing her ex-husband, Mr. Krum became belligerent and demanded that she authorize him to file suit against Ms. Shak's ex-husband.

7. It quickly became apparent that Mr. Krum sought to file suit against Ms. Shak's ex-husband to make a splash in the media for his own gain, regardless of whether it was in Ms. Shak's best interests.

8. When Ms. Shak declined to authorize the suit, Mr. Krum declared that she had discharged him and demanded that she pay him $135,000 for his work in drafting the complaint, accompanied by threats of suit if not paid promptly.

9. When Ms. Shak rejected this demand and reprimanded him for his conduct (without copying or including anyone else), Mr. Krum also threatened to sue her for defamation.

10. Ms. Shak does not owe Mr. Krum a dime. She engaged Mr. Krum on a contingent fee basis that expressly provided that Mr. Krum would be entitled to a fee only if there was a monetary recovery, of which there was none. Moreover, Mr. Krum's $135,000 fee demand is unenforceable, and Ms. Shak had every right to discharge Mr. Krum for cause.

11.     Further, Mr. Krum has refused, despite demand, to return the $10,000 "nonrefundable cost retainer" or even the more than $8,000 of the retainer that was never even applied to any alleged costs.  He has also refused to return Ms. Shak's files.

12.     Accordingly, Ms. Shak brings this action to protect herself against unlawful demands and threats and to obtain the return of her retainer.

## THE PARTIES, JURISDICTION, AND VENUE

13.     Ms. Shak is an individual who resides in Pennsylvania.  She maintains her specific address in confidence to protect her privacy and security.

14.     Mr. Krum is an individual who resides in New Jersey and lists his New York law office address as 500 East 83rd Street, Suite 8K, New York, New York 10028.

15.     This Court has subject jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, exclusive of interests and costs, and the controversy is between parties that are deemed citizens of different states.

16.     This Court may exercise personal jurisdiction over Mr. Krum because, among other things, he is a member of the Bar of the State of New York and conducts business within this State.

17.     Venue is proper in this judicial pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in this district, and (b) upon information and belief, property at issue in this action is located in this district.

## BACKGROUND

18.     Ms. Shak first met Mr. Krum on a blind date on or about October 27, 2017, after being introduced by a mutual acquaintance.

19.     During that date, Ms. Shak explained to Mr. Krum that although she had been married in June 2016, the marriage had been short-lived and she had filed for divorce in April 2017.

20.     In response to Mr. Krum's questioning regarding the reasons for the divorce, Ms. Shak explained why the marriage had failed.  (The substance of those communications that was provided in response to Mr. Krum's questioning is privileged, and the reasons are private, not essential to this suit, and are accordingly not disclosed here and should not be disclosed publically.)

21.     Mr. Krum suggested to Ms. Shak that she sue her ex-husband.

22.     During their next date, Mr. Krum continued to press Ms. Shak that she should sue her ex-husband, and Mr. Krum ultimately persuaded her to retain him on a contingent fee basis to potentially pursue a claim against her ex-husband.  At that time, Ms. Shak was still upset that her marriage had failed so quickly.

23.     With respect to the terms of the contingent fee engagement, Mr. Krum explained that Ms. Shak would not be responsible for any attorneys' fees but rather Mr. Krum would be paid out of any recovery and only if there was a recovery.  With respect to paying for the litigation expenses, Mr. Krum advised that he would require a $10,000 retainer to be used to cover the costs incurred.

24.     On or about November 20, 2017, Mr. Krum invited Ms. Shak to dinner at the Cheese Cake Factory in Cherry Hill, New Jersey.

25.     Over dinner, Mr. Krum presented her with a contingent fee agreement, which he instructed her to sign.

26.     Per his instruction, Ms. Shak signed the contingent fee agreement during her dinner with Mr. Krum that night.

27.     Among other things, the contingent fee agreement expressly provides: "CLIENT shall pay no attorney's fees if no monetary recovery is made." (Contingent Fee Agreement ¶ 4.)

28.      Also at Mr. Krum's direction during the dinner, Ms. Shak provided him with a $10,000 retainer check for expenses.  Per his instruction, Ms. Shak wrote on the check memo line "nonrefundable cost retainer."

29.     Mr. Krum never explained to Ms. Shak why the check had to be marked "nonrefundable," and she did not think to question him about it at the time.

30.     Mr. Krum picked up the tab for the dinner that night; he did not disclose to Ms. Shak that he intended to charge the cost of the dinner back against the retainer or that he was also billing for his time dining with her that night.

31.     In addition to persuading Ms. Shak to engage him, Mr. Krum advised Ms. Shak that she also needed to retain his law school classmate and friend, Larry Ginsberg, a family law attorney in Los Angeles, California.

32.     Mr. Krum insisted that retaining his friend Mr. Ginsberg was integral to her case against her ex-husband despite the fact that she already had her own New York family law attorney and there was no connection to California or any California law issue.

33.     At Mr. Krum's insistence, Ms. Shak sent Mr. Ginsberg a $5,000 retainer check.

34.     Over the next several weeks, Ms. Shak spoke with Mr. Krum by phone and attended several in-person meetings with him.

35.     Mr. Krum explained to her that these interviews were necessary for him to prepare a complaint against her ex-husband.  Many of these in-person meetings took place at Mr. Krum's house in New Jersey.

36.     Ms. Shak never met with Mr. Krum at his listed New York law office address. Ms. Shak did pick him up once at that address to drive him to a meeting, but he explained to her that the address was the residence of a woman he used to date who permitted him to use it as a "New York law office address."  Upon information and belief, Suite 8k is an apartment in a residential co-op.

37.     In approximately December 2017, Mr. Krum provided Ms. Shak with several drafts of a complaint for her review.

38.     After reviewing the drafts, Ms. Shak provided Mr. Krum with some feedback but remained unsure about whether she should proceed with a lawsuit against her ex-husband, particularly as her divorce proceedings appeared to be moving toward an amicable resolution.

39.     When Ms. Shak expressed her reservations to Mr. Krum, he became belligerent and attempted to coerce her into authorizing him to file the complaint.

40.     At one point, he tried to pressure Ms. Shak into filing the complaint by stating to her and her father (who is a licensed attorney) that he would not charge her anything if she permitted him to file the complaint but threatened he would charge her at $795 per hour for his time if she refused to go forward with the lawsuit, which bill he indicated would be substantial.

41.     Mr. Krum also disclosed to Ms. Shak that for his own personal financial situation, he needed to recover at least $1 million from the potential suit against her ex-husband.

42.     On or about December 15, 2017, after consulting with her father and another attorney with whom Mr. Krum had finally agreed to share his draft complaint, Ms. Shak became even more uncomfortable about moving forward with the complaint against her ex-husband.

43.     When Ms. Shak informed Mr. Krum that she was not prepared to file the complaint because, at the very least, she needed more time to consider it, Mr. Krum became furious and even more overbearing.

44.     Mr. Krum's conduct removed any doubt that the complaint was really all about advancing his own agenda rather than protecting Ms. Shak's interests.

45.     On January 2, 2018, Mr. Krum sent Ms. Shak an email advising that, in his view, Ms. Shak had effectively discharged him and now owed him $795/hr. for more than 150 hours he claimed to have spent meeting (and apparently including time dining) with her and drafting the complaint.

46.     On January 9, 2018, Mr. Krum sent Ms. Krum "Invoice No. 01," demanding that she pay him $135,769.18. Specifically, Mr. Krum demanded payment of $134,435.50 in fees for over 150 hours allegedly spent, among other things, interviewing Ms. Shak, conferring with his friend Mr. Ginsberg, and drafting the complaint.

47.     Among other things, the bill includes almost 8 hours or over $6,000 in fees that Mr. Krum apparently billed even before the November 3, 2017 engagement start date identified in the contingent fee agreement.

48.     Mr. Krum also demanded that Ms. Shak pay him $1,334.68 in expenses, including $778.80 for "computer research;" $120 for "copying/mailing charges;" $100 for "telephone/facsimile;" $270 for "working meals" with Ms. Shak; and $38.65 for a "working

meal" with an "attorney SK." Mr. Krum has never provided Ms. Shak with any back up for these charges.

49.     Mr. Krum's attempt to charge Ms. Shak – and his inflated bill in particular – were outrageous, and upon receipt of his invoice, Ms. Shak told him so privately.

50.     Ms. Shak also told Mr. Krum that she would not pay this shocking "bill," and she demanded the return of the $10,000 "nonrefundable cost retainer" that he had earlier extracted from her as well as her files.  Ms. Shak also reprimanded Mr. Krum for his conduct (again, she did so privately without copying or including anyone else).

51.     In response, Mr. Krum threatened to sue Ms. Shak for defamation.

52.     Mr. Krum also refused to return even the unused portion of the "$10,000 nonrefundable cost retainer" and has never returned Ms. Shak's files.

53.     On or about January 18, 2018, Mr. Krum presented Ms. Shak with a "Notice of Client's Right to Arbitrate a Dispute over Attorneys Fees," a copy of which is attached as Exhibit A, to resolve the dispute through Part 137 of the Rules of the Chief Administrator of the Courts.  Mr. Krum threatened to sue Ms. Shak unless she opted to consent to this fee dispute arbitration.

54.     On February 15, to avoid the additional burden and cost of litigation, Ms. Shak – through counsel – advised Mr. Krum that she had accepted his offer to resolve the dispute through the fee dispute resolution arbitration under Part 137 of the Rules of the Chief Administrator of the Courts.  Ms. Shak then filed a Client Request for Fee Arbitration with the appropriate office of the Joint Committee on Fee Disputes and Conciliation.

55.     Mr. Krum, however, denied that he had ever agreed to arbitration and refused to arbitrate the dispute unless Ms. Shak now agreed to additional terms, which Ms. Shak declined to do.

56.     Further, Mr. Krum once again threatened that he would sue Ms. Shak if she refused to accede to his latest demands.

57.     Mr. Krum's conduct is outrageous and has caused Ms. Shak harm.

## COUNT I DECLARATORY JUDGMENT

58.     Ms. Shak incorporates by reference the allegations of the preceding paragraphs.

59.     As described above, an actual justiciable controversy exists between Ms. Shak and Mr. Krum concerning (a) Mr. Krum's demand for payment of $135,769.18 for drafting a simple complaint against Ms. Shak's ex-husband; and (b) Mr. Krum's threat to sue Ms. Shak for defamation.

60.     Mr. Krum's demand for payment of over $135,000 in attorneys' fees and costs for drafting a complaint is contrary to the express terms of the contingent fee agreement, which provides in part: "CLIENT shall pay no attorney's fees if no monetary recovery is made." (Contingent Fee Agreement ¶ 4.)

61.     Ms. Shak never filed Mr. Krum's complaint nor has she pursued any of Mr. Krum's theories against her ex-husband and there has been no monetary recovery.

62.     Pursuant to the express terms of the contingent fee agreement, Ms. Shak does not owe any attorneys' fees to Mr. Krum.

63.     The demand for payment of over $135,000 in attorneys' fees and costs for drafting a simple complaint is also unenforceable because (a) a contingent fee agreement termination-of-services clause that purports to require the client to pay the discharged lawyer for all services rendered at the lawyer's hourly rate if the client abandons or dismisses its claims is

unenforceable; (b) such a fee demand is excessive and would restrict Ms. Shak's unfettered right to discharge and retain new counsel; and (c) Ms. Shak was entitled to discharge Mr. Krum for cause.

64.     Ms. Shak has also not defamed Mr. Krum nor could she defame him by rejecting his outrageous demand and reprimanding him individually for his reprehensible conduct.

65.     Ms. Shak is entitled to a declaration that (a) she does not owe Mr. Krum any money for attorneys' fees, costs, or otherwise, and (b) she has not defamed Mr. Krum and is not otherwise liable to Mr. Krum for defamation.

WHEREFORE, Ms. Shak respectfully requests that this Court grant judgment in her favor on this count, together with the following relief:

a.      A declaration that Ms. Shak (a) does not owe Mr. Krum any money for attorneys' fees, costs, or otherwise, and (b) has not defamed Mr. Krum and is not otherwise liable to Mr. Krum for defamation; and

b.      Such other relief as this Court deems just and proper.

## COUNT II UNJUST ENRICHMENT

66.     Ms. Shak incorporates by reference the allegations of the preceding paragraphs.

67.     As described above, on or about November 20, 2017, Ms. Shak provided Mr. Krum with a $10,000 cost retainer at his instruction and marked the check "nonrefundable cost retainer" at Mr. Krum's insistence.

68.     This nonrefundable retainer is unenforceable.

69.     Despite demand, Mr. Krum has refused to return the retainer or even the more than $8,000 unused portion of the retainer.

70.     Mr. Krum has also never provided any backup for or explained how he incurred $100 in "telephone/facsimile" charges; $778.80 in "computer research" charges; or $120 in

"copying/mailing" charges. And when he took Ms. Krum out to dinner or lunch, Mr. Krum did not inform her that, although he was paying the bill at the time, he would later charge the meals back to her against the retainer.

71.     Ms. Shak conferred a benefit upon Mr. Krum by providing him with a $10,000 retainer.

72.     Mr. Krum is unfairly benefiting from retaining the retainer and his retention of the $10,000 cost retainer is unjust, against equity and good conscience, and has caused Ms. Shak harm.

WHEREFORE, Ms. Shak respectfully requests that this Court grant judgment in her favor on this count, together with the following relief:

a.     An award of compensatory damages; and

b.     Such other relief as this Court deems just and proper.

Date: February 22, 2018                    **HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER**

                                           /s/ Ronald P. Schiller
                                           Ronald P. Schiller
                                           Robert L. Ebby*
                                           One Logan Square, 27th Floor
                                           Philadelphian, PA 19103
                                           (215) 568-6200

                                           *Attorneys for Beth Shak*

                    * Pro Hac Vice Application to be submitted

- 11 -